*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCWC-22-0000255
30-JUN-2026
08:39 AM
Dkt. 30 OP

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Respondent/Plaintiff-Appellee,

vs.

HENRY K. TOLENTINO,
Petitioner/Defendant-Appellant.

SCWC-22-0000255

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-22-0000255; CASE NO. 1CPC-19-0001524)

JUNE 30, 2026

McKENNA, ACTING C.J., AND EDDINS, JJ., AND
CIRCUIT JUDGE COPELAND, ASSIGNED BY REASON OF VACANCY;
WITH GINOZA, J., CONCURRING SEPARATELY AND DISSENTING, WITH WHOM
CIRCUIT JUDGE KIMURA, IN PLACE OF DEVENS, C.J., RECUSED, JOINS

OPINION OF THE COURT BY EDDINS, J.

Words spoken freely may convict. Words spoken involuntarily may not. Pretrial voluntariness hearings exist to tell the difference before it is too late.

In this case, the prosecution used a defendant's words to convict. Yet no evidentiary hearing determined whether those words were voluntarily spoken.

Article I, sections 5 and 10 of the Hawai'i Constitution, and Hawai'i Revised Statutes (HRS) § 621-26 (2016) independently require a pretrial evidentiary hearing to establish voluntariness before the factfinder hears an inculpatory statement. Because there was no evidentiary hearing, we vacate the defendant's conviction and remand for a new trial.

**I.**

"I'm sorry. I was just trying to get a Zip Pac." Henry Tolentino said these words as two Honolulu Police Department officers lifted him to his feet after handcuffing him.

This event followed a late-night traffic stop for speeding. After pulling over, Tolentino stepped out of his car. The officer drew his firearm. He ordered Tolentino to the ground. At first, Tolentino complied. Then he rose and fled. The officer chased him. When he caught up to Tolentino, the two struggled. According to the officer, Tolentino kicked and punched him. Tolentino took off again but quickly fell to the ground after stumbling into a parked car. The officer said that to detain and subdue Tolentino, he punched him in the face "[a]pproximately three, no more than five" times. The two continued to struggle until a second officer arrived and

"collided" into them, knocking all three to the ground. The officers cuffed Tolentino.

The State charged Tolentino with assault against a law enforcement officer in the first degree, HRS § 707-712.5(1)(a) (2014) ("[i]ntentionally or knowingly causes bodily injury to a law enforcement officer who is engaged in the performance of duty").

Tolentino moved in limine to exclude his statement. Neither a defense motion to suppress statements nor a prosecution motion for voluntariness hearing had been filed. At the motions in limine hearing, the prosecution conceded custody but denied interrogation. Then it described the expected factual circumstances.

The court denied the motion in limine. The excited utterance hearsay exception applied, it ruled. Defense counsel persisted. Only an evidentiary voluntariness hearing would preserve Tolentino's rights. He "would have a right to respond and to testify if we had an actual voluntariness hearing." The court upheld its evidentiary ruling and rejected the request for a hearing.

Before presenting the statement to the jury, the prosecution asked the court to find that Tolentino's statement was an "utterance[]" and "not the product of coercion." The court did. "[T]here was no coercion, and there was no question

asked by [the officer] when [Tolentino] made the unsolicited excited utterance." The statement came in as an excited utterance. See Hawai'i Rules of Evidence (HRE) Rule 803(b)(2) (hearsay exception when statement "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition").

The jury heard Tolentino's words. Later during closing argument, the State used them to prove guilt. The prosecutor told jurors that Tolentino "knew he did something wrong by saying I'm sorry."

The jury acquitted Tolentino of assault against a law enforcement officer in the first degree. But it found him guilty of the included offense of assault against a law enforcement officer in the second degree, HRS § 707-712.6 (2014) ("recklessly causes bodily injury to a law enforcement officer who is engaged in the performance of duty").

Tolentino appealed. He challenged the circuit court's failure to hold an evidentiary voluntariness hearing.

The Intermediate Court of Appeals (ICA) affirmed. HRS § 621-26 "does not expressly require the trial judge to hold a voluntariness hearing, but the trial judge must make a voluntariness *determinatio*n before the statement is admitted and without the jury present," the ICA held. (Emphasis added.) It concluded that "the circuit court made a voluntariness

determination at trial before evidence of the out-of-court statement was admitted and outside the presence of the jury. Therefore, the circuit court did not err by not conducting a separate voluntariness hearing." (Footnote omitted.)

Tolentino appealed.  We accepted cert.

## II.

Involuntary statements are inadmissible.  "Incriminating statements, to be admissible in evidence, must be voluntary." Territory v. Young, 37 Haw. 189, 192 (Haw. Terr. 1945).  The Hawai'i Constitution protects a defendant's "free and unconstrained choice" to speak.  State v. Baker, 147 Hawai'i 413, 422, 465 P.3d 860, 869 (2020).

Evidentiary reliability is one question.  Voluntariness is another.  Even "amply and convincingly corroborated" statements are inadmissible unless made voluntarily.  Id. at 431 n.26, 465 P.3d at 878 n.26.

To prevent juries from hearing involuntary statements, our law provides a procedural safeguard.  The trial court must conduct an evidentiary voluntariness hearing before it admits a defendant's inculpatory statement.  Due process, the right against self-incrimination, and HRS § 621-26 compel a hearing.

We explain the contours of the hearing requirement under each source.

A.    Due Process

The Hawai'i Constitution's due process clause, article I, section 5, protects the right to a fair trial.  State v. Bowe, 77 Hawai'i 51, 59, 881 P.2d 538, 546 (1994).  Fair trials and involuntary statements are incompatible.  See State v. Eli, 126 Hawai'i 510, 520 n.17, 273 P.3d 1196, 1206 n.17 (2012).

This court has long tethered voluntariness to due process principles.  See, e.g., Ex parte Palakiko, 39 Haw. 141, 145-46 (Haw. Terr. 1951) ("whether the petitioner's confessions were freely and voluntarily made, . . . also answer[s] the question whether the use of the confessions involved a denial of due process"); State v. Shon, 47 Haw. 158, 166, 385 P.2d 830, 836 (1963) (use of an involuntary confession "offends due process") (citation omitted).

Wakinekona identified three "basic considerations" for excluding involuntary statements:  (1) the inherent untrustworthiness of those statements and the resulting threat to trial reliability; (2) our commitment to an accusatorial rather than inquisitorial system of justice; and (3) the principle that the State should not break the law to achieve law enforcement objectives.  State v. Wakinekona, 53 Haw. 574, 576, 499 P.2d 678, 680 (1972).  Each rationale addresses core due process concerns - fundamental fairness and the integrity of the outcome.

6

First, reliability ensures the accuracy of factfinding. When physical trauma, psychological pressure, mental impairment, or external circumstances overwhelm a person's will, their words may not reflect reality. See Bowe, 77 Hawai'i at 57, 881 P.2d at 544 ("[a]n involuntary confession is inherently untrustworthy because the free will of an individual is overborne"). Confusion, fear, a desire to de-escalate the situation, or an impaired capacity for rational thought may motivate a person's words. Some circumstances make a person an unreliable truth-teller.

Second, our system's accusatorial character forces the State to prove its case through "independently and freely secured" evidence. Baker, 147 Hawai'i at 436, 465 P.3d at 883 (quoting Rogers v. Richmond, 365 U.S. 534, 541 (1961)). The prosecution may not therefore use a defendant's own words to convict, unless it proves those words were voluntarily spoken. Id.

Third, due process forbids the State from obtaining guilty verdicts and guilty pleas by methods the justice system execrates. The government cannot erode liberty through lawlessness. Wakinekona, 53 Haw. at 576, 499 P.2d at 680.

Evidentiary hearings are constitutionally required to avoid these hazards and detect involuntariness. Omitting the hearing produces two due process violations.

One, there is a substantive violation if the statement was in fact involuntary.  See Eli, 126 Hawaiʻi at 520 n.17, 273 P.3d at 1206 n.17 ("due process, based on article 1, section 5 of the Hawaiʻi Constitution, requires a statement to be 'voluntary' in order to be admissible").  Two, denying the evidentiary hearing itself violates due process, regardless of whether the statement was actually voluntary.  See State v. Green, 51 Haw. 260, 264, 457 P.2d 505, 508 (1969) ("trial judge has a duty to determine the admissibility of an inculpatory statement out of the presence of the jury and prior to the jury's exposure to such evidence"); State v. Naititi, 104 Hawaiʻi 224, 233, 87 P.3d 893, 902 (2004) (citing Jackson v. Denno, 378 U.S. 368, 382-83 (1964)) ("failure to conduct hearing into voluntariness of defendant's confession amount[s] to denial of due process").

The procedural due process violation is no less serious than the substantive one.  Once the jury hears an involuntary statement, the damage is done.  Due process demands "a fair hearing and a reliable determination" of voluntariness before that happens.  See Jackson, 378 U.S. at 377; State v. Mitake, 64 Haw. 217, 221-22, 638 P.2d 324, 328 (1981) (admissibility of identification evidence).

"Due process is versatile.  Context shapes the process that is due."  Interest of JH, 152 Hawaiʻi 373, 381, 526 P.3d 350, 358 (2023).  Article I, section 5 "is agile. . . .  [It] calls for

8

such procedural protections as the particular situation demands," especially those "necessary to preserve the integrity of the judicial process." State v. Zuffante, 157 Hawai'i 194, 207, 576 P.3d 243, 256 (2025).

Rights without enforcement are hollow. Procedural protections animate due process and the right against self-incrimination. Evidentiary hearings, like other safeguards, make the rights real. They transform constitutional text into constitutional reality.

The evidentiary hearing itself is the constitutional requirement. Within that hearing, defendants enjoy procedural rights. As with suppression hearings, defendants may testify at voluntariness hearings without that testimony being used against them at trial. State v. Chang, 144 Hawai'i 535, 545, 445 P.3d 116, 126 (2019). Courts must inform defendants of this protection so the choice to testify or not is made knowingly and voluntarily. Id.

Skipping a voluntariness hearing snips process and deprives the defendant of these protections. Condensed procedures do not satisfy article I, section 5. Courts may not cut corners when "due process rights stakes are high." Zuffante, 157 Hawai'i at 208, 576 P.3d at 257.

The criminal justice system chooses free will. "[D]ue process derives much of its meaning from a conception of

fundamental fairness that emphasizes the right to make vital choices voluntarily." Bowe, 77 Hawaiʻi at 59, 881 P.2d at 546 (quoting Colorado v. Connelly, 479 U.S. 157, 176 (1986) (Brennan, J., dissenting)). "This right requires vigilant protection if we are to safeguard the values of private conscience and human dignity." Id.

We clarify that a reliable judicial determination of voluntariness means a pretrial evidentiary proceeding where facts are developed, tested, and found.

Perfunctory review, prosecutorial representations, and hearsay analyses do not constitute a "reliable determination." Due process demands a hearing with three essential pieces: under oath testimony, cross-examination, and evidence-based findings.

Argument is not evidence. Proffers are not evidence. Testimony is.

## B. Right Against Self-Incrimination

Freedom of choice, to speak or not to speak, is article I, section 10's essence. Haw. Const. art. I, § 10 ("No person shall . . . be compelled in any criminal case to be a witness against oneself."). The voluntariness requirement links to the right against self-incrimination, not just to due process. State v. Kelekolio, 74 Haw. 479, 502, 849 P.2d 58, 69 (1993) (right against self-incrimination requires that all

10

"extrajudicial admissions of guilt" must be "voluntarily given"); State v. Matsumoto, 145 Hawai'i 313, 324-25, 452 P.3d 310, 321-22 (2019) (assessing coercive interrogation tactics under a right against self-incrimination framework).

An inculpatory statement must flow from the defendant's free and voluntary choice. If it doesn't, the factfinder may not hear the statement. This rule "reflects a recognition of the importance of free will[.]" Bowe, 77 Hawai'i at 58, 881 P.2d at 545 (quoting Connelly, 479 U.S. at 176 (Brennan, J., dissenting)). It preserves the autonomy and dignity interests underlying the right against self-incrimination. See State v. Kamana'o, 103 Hawai'i 315, 320, 82 P.3d 401, 406 (2003).

Article I, section 10 operates through procedural safeguards to fulfill its promise. See, e.g., State v. Santiago, 53 Haw. 254, 492 P.2d 657 (1971) (Miranda warnings); State v. Hewitt, 153 Hawai'i 33, 43, 526 P.3d 558, 568 (2023) (same); Tachibana v. State, 79 Hawai'i 226, 900 P.2d 1293 (1995) (mandatory colloquy and on-the-record waiver to protect right to testify); State v. Pomroy, 132 Hawai'i 85, 92, 319 P.3d 1093, 1100 (2014) (mandatory colloquy and on-the-record waiver to protect right not to testify); Zuffante, 157 Hawai'i at 201, 576 P.3d at 250 (videorecording custodial interrogations).

A voluntariness hearing enforces the right not to be a witness against oneself.  A hearing verifies words were freely spoken before the prosecution uses them to prove guilt.

Most inculpatory statements arise during police encounters.  Free will though may be overcome without state involvement.  The constitutional principles that compel a hearing transcend police conduct.  See Bowe, 77 Hawai'i at 57-58, 60-61, 881 P.2d at 544-45, 547-48.

Custody or no custody.  Interrogation or no interrogation.  Those familiar considerations are sometimes beside the point.

Involuntariness has many sources.  Physical trauma, mental health crisis, medical emergency, violent confrontation, or fear may crush free will without police questioning.  See Kelekolio, 74 Haw. at 503, 849 P.2d at 69-70 ("mental and physical condition" is relevant to voluntariness); id. (citing Commonwealth v. Peterson, 424 S.E.2d 722, 723-24 (Va. Ct. App. 1992)) (physical trauma, pain, impaired breathing, blurred vision, and cocaine intoxication - not police conduct – rendered the defendant's statements involuntary).

The constitutional inquiry is both singular and decisive.  Did the defendant speak voluntarily given all the circumstances?  See Kelekolio, 74 Haw. at 502, 849 P.2d at 69.  Only an evidentiary hearing reliably answers that question.  It is a "reasonable and necessary safeguard, essential to the protection

12

of the . . . right against self-incrimination[.]" Zuffante, 157 Hawai'i at 208, 576 P.3d at 257.

A hearing makes the right against self-incrimination real, not theoretical. It prevents a jury from hearing the defendant's statement until the court determines voluntariness. The super-probative value of an accused's words necessitates pretrial vetting. See id. at 203, 576 P.3d at 252.

A hearing also prevents procedural shortcuts. The prosecution's proffer will not do. Hearings provide defendants with a meaningful opportunity to contest the circumstances surrounding their statements. What's more, a hearing aids appellate review. It creates a reliable record. A voluntariness determination "often requires a rigorous review" of the evidence. State v. Kazanas, 138 Hawai'i 23, 41, 375 P.3d 1261, 1279 (2016).

**C. HRS § 621-26**

The constitutional protections under article I, sections 5 and 10 separately require voluntariness hearings for inculpatory statements. HRS § 621-26 reinforces these constitutional obligations. But it does not create them. This distinction matters. Legislatures may repeal or amend statutes. Constitutional protections are not so easy to alter. And when the two collide, constitutional protections win.

Beyond constitutional essentials, though, HRS § 621-26 independently mandates voluntariness hearings. "No confession shall be received in evidence unless it is first made to appear to the judge before whom the case is being tried that the confession was in fact voluntarily made." HRS § 621-26.

HRS § 621-26's language creates obligations distinct from the right against self-incrimination and constitutional due process. This law carries forward common law principles that trace to the Kingdom of Hawai'i. See, e.g., The King v. Paakaula, 3 Haw. 30, 39 (Haw. Kingdom 1867) (confession "is legitimate evidence" only if "freely and voluntarily made"); see also Naititi, 104 Hawai'i at 234, 87 P.3d at 903 (quoting Bowe, 77 Hawai'i at 61, 881 P.2d at 548 (Klein, J., concurring)) ("leading authorities" show that "HRS § 621-26 was essentially a codification of the common law rule against coerced confessions").

HRS § 621-26 - like article I, sections 5 and 10 - applies to all statements qualifying as "inculpatory statements." Though the statute speaks of a "confession," this court has interpreted that noun to cover any inculpatory statement, not just an admission of guilt. See Green, 51 Haw. at 264, 457 P.2d at 508; Kelekolio, 74 Haw. at 501 n.13, 849 P.2d at 69 n.13.

For good reason. A pinched reading of "confession" defangs HRS § 621-26. Prosecutions are assembled through forensic

14

evidence, witness testimony, documentary and physical evidence, surveillance footage, and more. Prosecutors also rely on partial admissions, ambiguous remarks, or other statements by a defendant that tend to establish guilt. Admissions to every element are less frequent. Narrowing the statute to complete confessions would exclude the very statements prosecutors typically rely on to convict.

For inculpatory statements the statute is absolute. No hearing, no admission. Voluntariness hearings are a "statutory requirement." Naititi, 104 Hawai'i at 233, 87 P.3d at 902 ("[p]ursuant to HRS § 621-26, the trial court must make a determination of voluntariness[;] . . . [w]hether a motion to determine the voluntariness . . . is initiated by the prosecution, the defense, or sua sponte by the trial court, is ultimately immaterial to the statutory requirement of a voluntariness hearing").

The ICA erred by reading HRS § 621-26 to require only a voluntariness *determination*, not an evidentiary hearing.

HRS § 621-26 has four textual features that compel evidentiary hearings. First, the statute says "No," foreclosing admission as the default. Second, "made to appear" means evidence, not argument. Witness testimony, documents, and physical evidence support factual findings. Proffers, legal argument, and advocacy do not. The statute calls for proof, not

persuasion. Lawyers talk. Evidence proves. Third, "in fact" separates evidence from conclusion. A court may determine, find, or conclude voluntariness by legal reasoning, like it does with hearsay exceptions. But it can only establish voluntariness "in fact" through evidence that shows the actual circumstances of the statement. Fourth, "first" fixes the sequence. No statement may be "received in evidence" until the State proves voluntariness.

Together, these textual elements lead to one conclusion. Before any inculpatory statement goes to the jury, the prosecution must establish voluntariness through evidence.

The legislature could have written a permissive rule. It did not. The statute forbids admission until voluntariness is established through evidence at a hearing before trial. The command is unconditional.

Once a statement reaches the jury without that hearing, the statutory violation is complete. No later hearing can undo what the jury heard. The statute does not permit a backward-looking cure. Not after a verdict, not on appeal, and not on remand.

### III.

The circuit court admitted Tolentino's statement as an excited utterance. So the jury heard him say, "I'm sorry. I was just trying to get a Zip Pac." The jury also listened to the circumstances surrounding Tolentino's words.

The ICA agreed with both the trial court's hearsay ruling and its belief that HRS § 621-26 requires only a voluntariness determination, not an evidentiary hearing.

Courts err by conflating evidentiary and constitutional doctrines. A statement's classification as an "excited utterance" or as any hearsay exception (like a HRE Rule 803(a)(1) admission by party-opponent), does not resolve the constitutional question of voluntariness.

Hearsay rules and constitutional voluntariness protections serve different purposes. A statement may be spontaneous because no question prompted it, yet involuntary because coercion, pain, injury, or other circumstances overbore the speaker's will. See Kelekolio, 74 Haw. at 503, 849 P.2d at 70. The court's assessment depends on whether the statement was in fact "freely and voluntarily given." Id. at 501, 849 P.2d at 69.

The trial court makes two constitutional determinations before applying evidentiary rules. First Miranda. The court determines whether custodial interrogation took place and whether officers gave warnings. Hewitt, 153 Hawai'i at 43, 526 P.3d at 568. Second voluntariness. Courts "examine the entire record and make an independent determination of the ultimate issue of voluntariness based on the totality of circumstances." Kazanas, 138 Hawai'i at 41, 375 P.3d at 1279. Only after a

17

statement satisfies constitutional requirements does the trial court address hearsay admissibility.

The circuit court applied the excited utterance hearsay exception. HRE Rule 803(b)(2) applies to statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Like other hearsay exceptions, the rule rests on a reliability theory. The stress of excitement makes fabrication unlikely.

The circuit court's excited utterance analysis looked at hearsay reliability. Yet it overlooked the separate constitutional voluntariness inquiry. Sure, a statement may be a reliable excited utterance. But it still may be involuntary if the rule's very stress - combined with pain, fear, confusion, coercion, or any other overbearing external influence - overcomes the defendant's will. The inquiries are distinct. See Baker, 147 Hawai'i at 431 n.26, 465 P.3d at 878 n.26 ("The question of coercion is separate from that of reliability.").

The circuit court and the ICA erred by using the excited utterance hearsay exception to bypass an evidence-based voluntariness determination. When a trial court admits an inculpatory statement without receiving evidence at a hearing and finding voluntariness, the court ducks its gatekeeping role.

18

Here, no witness testified about the violent event before the prosecution presented trial evidence. The court relied solely on the prosecution's representations to admit Tolentino's statement. Tolentino had no chance to offer evidence, testify, or cross the prosecution's witnesses before the jury heard his statement.

Omitting the voluntariness hearing violated article I, sections 5 and 10, and HRS § 621-26.

The court's failure to hold a hearing may have resulted in both substantive and procedural due process violations. Substantively, if the statement was involuntary, using it to convict violated due process. But who knows? We cannot determine actual voluntariness without an evidentiary record. The procedural violation, however, is clear. The hearing itself was required. The trial court denied the evidentiary hearing article I, section 5 demands. See Green, 51 Haw. at 264, 457 P.2d at 508.

The admission of Tolentino's statement also violated article I, section 10. This provision serves as a procedural safeguard. Before the State may use a defendant's inculpatory statement, the Hawai'i Constitution requires proof of voluntariness. See Kelekolio, 74 Haw. at 502, 849 P.2d at 69.

HRS § 621-26 supplies a third, independent requirement. The prosecution used Tolentino's words to convict. Yet it never

established at an evidentiary hearing that those words were "in fact" freely made.

These errors were not harmless.

The use of a defendant's inadmissible inculpatory statement is evaluated under the "harmless beyond a reasonable doubt" standard. Baker, 147 Hawaiʻi at 435, 465 P.3d at 882. We ask "whether there was a reasonable possibility that the error [might have] affected the outcome[.]" State v. Aplaca, 96 Hawaiʻi 17, 26, 25 P.3d 792, 801 (2001). Because a hung jury mistrial is a different outcome, "[t]he reasonable possibility standard, then, is satisfied if there's a showing that it's reasonably possible that, . . . a single juror would have voted differently." State v. Hirata, 152 Hawaiʻi 27, 33, 520 P.3d 225, 231 (2022).

There is a reasonable possibility that Tolentino's statement might have contributed to his conviction for recklessly causing bodily injury to a law enforcement officer engaged in the performance of duty. See HRS § 707-712.6.

An apology's consciousness of guilt quality is potent. Here, the State spotlighted Tolentino's statement during closing. "He knew he did something wrong by saying I'm sorry," the prosecution urged. The State argued the statement proved Tolentino acted intentionally or knowingly and committed the assault offense as charged.

The jury's verdict reflected only reckless conduct. Apologies however do not distinguish between intentional and reckless conduct. People apologize for both. And when they do, a rational inference is that they concede responsibility for their conduct.

"An accused's words matter. Confessions have more impact on verdicts than other evidence." Zuffante, 157 Hawai'i at 203, 576 P.3d at 252. Tolentino's apology might have contributed to his conviction. Cf. Baker, 147 Hawai'i at 435, 465 P.3d at 882 (admission of an involuntary statement is not harmless error when the "conviction is largely dependent on a jury's determination as to the credibility of the complainant's testimony" and the erroneous admission "contributes to the credibility of that testimony").

## IV.

The dissent agrees that the trial court erred.

We disagree on what to do about it. Relying on Jackson v. Denno, 378 U.S. 368 (1964) and State v. Goers, 61 Haw. 198, 600 P.2d 1142 (1979), the dissent would remand for a post-trial voluntariness hearing.

We hold that article I, sections 5, 10, and 14 of the Hawai'i Constitution, and HRS § 621-26 require a new trial.

Several reasons compel a new trial.

First, the dissent's reliance on Jackson and Goers overlooks the autonomous nature of our state's constitutional tradition. Jackson interprets the federal due process clause. Goers followed Jackson but failed to engage in the state-specific interpretive work required to honor the role our constitution demands.

The Hawai'i Constitution is a sovereign document that this court interprets independently of federal precedent. State v. Wilson, 154 Hawai'i 8, 14, 543 P.3d 440, 446 (2024); State v. Kaluna, 55 Haw. 361, 369 n.6, 520 P.2d 51, 58 n.6 (1974).

Independence is not optional. It is a constitutional command, not a doctrinal preference. "State constitutions have a distinct role under our nation's system of federalism. Deciding a case first on state constitutional grounds respects state sovereignty and aligns with a key constitutional design feature – subnational governance." Wilson, 154 Hawai'i at 14, 543 P.3d at 446.

As independent sources of law, each constitution carries its own interpretive authority. We rely on the traditional tools of constitutional interpretation: text, canons of construction, purpose and consequences relative to purpose, precedent, structural design, and historical, social, and cultural context. See Hilo Bay Marina, LLC v. State, 156 Hawai'i 478, 511, 575 P.3d 568, 601 (2025). Our court is also uniquely

inspired by the Aloha Spirit, Hawai'i values, and a profound respect for human and nature's dignity.  Id.  Honoring our constitution means giving it a reading shaped by Hawai'i and the people who adopted it — not through federal precedent about a different document.

Just months ago, this court said it again in Zuffante.  Article I, section 5 does more than federal due process, operates differently, and "offers safety to Hawai'i's people that exceeds the federal constitution's suddenly fluid protections."  Zuffante, 157 Hawai'i at 200, 576 P.3d at 249.

Hawai'i's due process clause controls this case.  No federal precedent, Jackson included, can displace it.  Article I, section 5 is not simply the federal constitution in different words.  It is a distinct Hawai'i mandate for fairness - agile, independent, and rooted in our own constitutional tradition.

HRS § 621-26 reinforces this boundary.  Our law has no federal analogue.  Its absolutism is a Hawai'i creation.  Jackson did not consider it.  Jackson cannot constrain it.

The outcome in Jackson is a specific remedial accommodation rooted in federalism.  When a state trial court denied a voluntariness hearing, Jackson permitted a post-trial cure - a remand for a hearing and reinstatement of the conviction if the statement was found voluntary.  378 U.S. at 391-95.  This

approach flowed from the federal courts' deference to state criminal proceedings already concluded. Jackson itself stressed that imposing a federal remand-and-retry rule would interfere with the proper federal-state relationship and the state's freedom to choose its own remedy. Id. at 395. The case governed federal review of state convictions and nothing more. See id. at 393 (The defendant "is entitled to a determination of the voluntariness of his confession in the state courts in accordance with valid state procedures.") (emphasis added).

Federal precedent like Jackson cannot disturb the autonomous guarantees afforded under the Hawai'i Constitution. This court has an independent, essential duty to provide the broader safeguards our state constitution advances. While Goers imported the federal remedy in 1979, we decline the invite to apply it now. The proper remedy is a new trial.

The dissent reads Chang narrowly, suggesting the prospective rule against condensing pretrial procedures rested only on Hawai'i Rules of Penal Procedure (HRPP) Rule 12(e), the State's right to appeal under HRS § 641-13(7) (2014), and "administrative complications."

That view is half-right. Chang did rely on those rule-and-statute grounds to declare consolidation impermissible. But Chang's reasoning ran deeper.

The court's animating concern was that consolidation made it impossible for a defendant to exercise the right to testify at a suppression hearing without exposing that testimony to use at trial. Chang, 144 Hawai'i at 545, 445 P.3d at 126. This concern is constitutional, rather than administrative.

It belongs to the article I, section 14 right to present a defense, the article I, section 10 right against compelled self-incrimination, and the article I, section 5 right to a fair trial. The first of these subsumes the right to testify. Together these provisions safeguard a defendant's freedom to speak at a voluntariness hearing without that testimony following them to trial. Id. A defendant testifying about the circumstances of a statement must be able to do so without the testimony being used against them at trial. Id. (recognizing the protection); see also HRS § 621-26 (requiring evidence at the hearing).

Goers permitted voluntariness determinations "at any time prior to the admission of the confession into evidence." 61 Haw. at 201, 600 P.2d at 1144. While this enabled during-trial hearings, its lockstep adherence to Jackson effectively imported a federal remedial framework (including post-appeal cures) without considering its incompatibility with the Hawai'i Constitution or HRS § 621-26. We now decline to follow that scheme.

Chang's recognition of inseverable pretrial protections clashes with Goers' any time allowance. The statutory and constitutional protections only work if the hearing happens before trial. Essential safeguards like the right to testify without trial use and an informed colloquy fail to function properly when a hearing is delayed until after the State has begun its case. Chang, 144 Hawai'i at 545, 554, 445 P.3d at 126, 135.

We resolve this conflict today.

We overrule Goers to the extent it permits voluntariness determinations after trial begins. The constitution and the statute require a pretrial hearing that occurs before trial. This timing ensures that the procedural protections Chang identified are not compromised by a during-trial or post-trial posture.

Second, the procedural violation is itself the constitutional and statutory injury. The standalone violation of the Hawai'i Constitution and HRS § 621-26 does not depend on whether the statement was actually voluntary. Failing to conduct a voluntariness hearing denies due process. Naititi, 104 Hawai'i at 233, 87 P.3d at 902 (citing Jackson, 378 U.S. at 382-83). Once the jury hears the words without a hearing, the constitutional injury is complete. The damage is done.

The dissent's remand asks one question:  Was the statement voluntary?  That's the wrong question.  The right question is whether Tolentino received the constitutionally and statutorily required process.  He did not.

Because the procedural violation is a standalone injury, no postponed finding can supply what the law required before trial.  HRS § 621-26 forbids receiving a statement until voluntariness is "first made to appear."  Once that command is violated, the injury is complete.  A voluntariness ruling made years later does not reverse the violation; it only confirms it occurred.

Third, the protections a pretrial hearing provides cannot be retroactively restored.  At a pretrial hearing, a defendant speaks freely about the circumstances of the statement, including any physical trauma, coercion, or impaired mental state, because hearing testimony cannot be used at trial.  Chang, 144 Hawai'i at 545, 445 P.3d at 126.  That guarantee presupposes a trial yet to come.  After conviction, Chang's wall between the hearing and the trial collapses.  While hearing testimony cannot be used at a trial that has already happened, that same testimony determines whether the existing conviction stands.  In this posture, the protection is drained.

The strategic posture is equally compromised.  At a pretrial hearing, no trial testimony exists and no verdict has been rendered.  The defendant weighs whether to contest

27

voluntariness without knowing how trial will unfold. A post-conviction hearing eliminates that calculus because the trial record is fixed and the verdict is known. The defendant must then decide whether to testify in a proceeding designed to validate the very conviction the appeal challenged. If the defendant chooses to testify, the words merely shape a case already decided. If the defendant stays silent, the prosecution establishes voluntariness unopposed by using the full trial record. Either way, the defendant does not enjoy the procedural protections Chang guarantees.

Defense counsel recognized this at the motions in limine hearing. Tolentino "would have a right to respond and to testify if we had an actual voluntariness hearing." That right was denied. A post-appeal hearing does not revive it. It offers a different proceeding, in a different posture, at a different stage.

Fourth, time has eroded the record. The event occurred on September 21, 2019, over six years ago. Tolentino's statement followed a late-night traffic stop, a foot chase, a physical struggle, three to five punches to the face, a collision with a parked car, and a second officer's tackle. These circumstances bear directly on voluntariness. See Kelekolio, 74 Haw. at 503, 849 P.2d at 69-70 (physical and mental condition relevant to voluntariness). The factual granularity a voluntariness hearing

demands - including the officers' precise observations of Tolentino's demeanor, coherence, signs of head injury, level of disorientation, and indicia of intoxication - degrades with time. A hearing held now is not the hearing the constitution contemplated; it is a reconstruction from faded memory. Due process under article I, section 5 requires more.

Fifth, the error was not harmless under Hawai'i's stringent standard. This court asks whether there is a reasonable possibility that the error might have contributed to the conviction. Hirata, 152 Hawai'i at 33, 520 P.3d at 231.

The prosecution used the statement as direct proof of guilt. In closing argument, the prosecutor told the jury that Tolentino "knew he did something wrong by saying I'm sorry." The jury acquitted on the intentional charge and convicted on the reckless lesser-included offense. Consciousness-of-wrongdoing evidence plays directly into a reckless mental-state determination, which was precisely the use the prosecution made of Tolentino's apology. We cannot say there is no reasonable possibility the statement contributed to the verdict. A backward-looking voluntariness finding does not change that. The statement reached the jury, the jury weighed it, and the verdict was rendered.

Sixth, the dissent's framework produces a remedial asymmetry. If the statement was involuntary, the post-trial

hearing leads to a new trial, the same remedy we order today. However, if the statement is found voluntary, the conviction stands despite the undisputed procedural violation. Heads, the State breaks even; tails, the State wins. The framework gives the prosecution a second chance to establish what it failed to prove the first time. Yet it provides the defendant no relief for the constitutional and statutory injury already suffered.

We do not permit such asymmetry for analogous procedural rights, like Tachibana colloquies or jury trial waivers. The right is violated at the time of trial.

The remedy is a new trial where the constitutional and statutory right is vindicated. On remand, if the State intends to use Tolentino's statement, it must first establish voluntariness at an evidentiary hearing that satisfies article I, section 5, HRS § 621-26, and the framework set forth in Part V.

This hearing will occur in the posture the Hawai'i Constitution and the statute contemplate. If the statement is found to be voluntary, it may be admitted. If it is not, the trial proceeds without it. That is the process the law requires. It should have happened before the first trial and will occur before the second.

The error was not harmless. Tolentino gets a new trial.

**V.**

The lower courts misapplied the constitutional and statutory requirements for pretrial evidentiary voluntariness hearings. We address two questions to guide trial courts going forward. First, when hearings are required. Second, how they are conducted.

**A.    Defining "Inculpatory Statement"**

We define "inculpatory statement" and clarify when that definition prompts the trial court's duty to conduct a pretrial voluntariness hearing.

The definition of an "inculpatory statement" is broad and extends beyond full confessions. It includes any words spoken by the defendant that allows the factfinder to infer guilt. An inculpatory statement is any statement made by a defendant that "admits a fact, circumstance or involvement which tends to establish guilt or from which guilt may be inferred." Kelekolio, 74 Haw. at 501 n.13, 849 P.2d at 69 n.13 (quoting Black's Law Dictionary 768 (6th ed. 1990)). Inculpatory effect, not form, controls the analysis.

To aid trial courts, we identify core types of statements that exemplify the scope of the definition.

Express admissions relating to the charged or included offense, or facts establishing material elements, are

inculpatory. Ambiguous admissions likewise necessitate the hearing requirement.

Statements used to show consciousness of wrongdoing through their falsity also serve an inculpatory purpose. A false alibi is a classic example. Similarly, a statement contradicted by other evidence, when offered to show that the defendant lied because of consciousness of guilt, is inculpatory in character.

These core types represent the primary ways the State deploys a defendant's words to secure conviction. While they show the range of the definition, they are not exhaustive. Applying the law requires examining the specific facts of each case. Courts must assess the inculpatory character of a statement through the totality of the circumstances.

Content and language matter. Courts consider what the defendant said. Does the statement admit criminal conduct, culpable state of mind, or facts from which juries may infer guilt?

Context also matters. A statement's inculpatory nature depends on context, not words alone. A statement innocuous in one setting may incriminate in another. For instance, neutral-sounding words may become inculpatory when spoken during arrest, while struggling with police, or when confronted with evidence.

Another relevant consideration is intended use. Courts should look at the prosecution's purpose. Will the State use

the statement to prove state of mind, establish conduct, or link the defendant to a charged or included offense?  A statement's phrasing does not exempt it from constitutional or statutory vetting if the prosecution uses the words to establish guilt.

The standard asks whether a statement tends to establish guilt.  Kelekolio, 74 Haw. at 501 n.13, 849 P.2d at 69 n.13. The inquiry focuses on the actual role the statement plays in the prosecution's case; specifically whether the statement helps prove an element, undermines a defense, shows motive, suggests consciousness of wrongdoing, or otherwise meaningfully contributes to the State's proof.  Statements with only an attenuated bearing on guilt fall outside the framework.

Constitutional principles compel this scope.  Article I, section 5 and 10's requirements activate whenever the State seeks to use a defendant's own words as evidence of guilt.  See Wakinekona, 53 Haw. at 576, 499 P.2d at 680 (due process prevents the State's use of any involuntary "extra-judicial admission[] of guilt"); Kelekolio, 74 Haw. at 501 n.13, 849 P.2d at 69 n.13 (there is "no meaningful distinction between a 'confession' and an 'inculpatory statement' for purposes of the right against self-incrimination").

A broad scope aligns with our precedent.  This court has long interpreted "confession" in HRS § 621-26 to include more than just outright admissions of guilt.  See Green, 51 Haw. at

33

264, 457 P.2d at 508 (invoking HRS § 621-26 to require trial courts to determine the voluntariness of any "inculpatory statement").  Our jurisprudence reflects a commitment to protecting against the use of any involuntary statement – whether a partial admission, an ambiguous remark, or a statement that otherwise supports the prosecution's case - that may contribute to a conviction.  See Kelekolio, 74 Haw. at 502, 849 P.2d at 69.  Because these statements serve the same prosecutorial purpose as a full-fledged confession, we adopt an inclusive, functional definition.

Here, Tolentino's statement, "I'm sorry.  I was just trying to get a Zip Pac," qualifies as an inculpatory statement.  The apology is ambiguous.  It could imply that Tolentino believed he did something wrong.  And that's how the prosecution understood it, using the statement as direct proof of guilt.  Tolentino "knew he did something wrong by saying I'm sorry," the prosecutor told the jury.

B.   **Framework for Voluntariness Hearings**

Inculpatory character is a constitutional catalyst for procedural protections.  Once a statement falls within the definition, the constitutional and statutory framework dictates how voluntariness must be determined.  The hearing framework has six essential features.

34

First, courts must conduct voluntariness hearings pretrial for known inculpatory statements. HRPP Rule 16(b)(1)(ii) already requires the State to disclose the defendant's written, recorded, and oral statements before trial. When the prosecution intends to introduce a disclosed statement as evidence of guilt – thereby meeting our definition of an inculpatory statement - due process and HRS § 621-26 require a pretrial evidentiary hearing.

A narrow exception to the pretrial requirement covers statements the prosecution could not have disclosed. When an inculpatory statement emerges unexpectedly at trial, the trial court must determine voluntariness "out of the presence of the jury and prior to the jury's exposure to such evidence." Green, 51 Haw. at 264, 457 P.2d at 508. Failure to make that determination before the words are admitted creates the same constitutional injury as failure to hold a pretrial hearing. It warrants the same remedy, a new trial.

Second, either side may move for a hearing. The defense often moves to suppress statements. See, e.g., Bowe, 77 Hawai'i at 53, 881 P.2d at 540; Chang, 144 Hawai'i at 537, 445 P.3d at 118. And the State routinely files motions to determine voluntariness. See, e.g., Baker, 147 Hawai'i at 416, 465 P.3d at 863; Eli, 126 Hawai'i at 514, 273 P.3d at 1200. Even without a

35

motion, the court has a duty to order a hearing on its own.  See Naititi, 104 Hawai'i at 233, 87 P.3d at 902.

Third, these are *evidentiary* hearings.  Because voluntariness turns on disputed facts and circumstances, including the defendant's physical condition, mental state, and the presence of coercion, courts must develop an evidentiary record.  Argument or proffers do not establish voluntariness.  Only evidence does.  The prosecution has the burden to prove voluntariness by a preponderance of the evidence.  See State v. Martin, 146 Hawai'i 365, 385, 463 P.3d 1022, 1042 (2020).  Both parties may call and cross-examine witnesses and present evidence.  The court hears that evidence and enters findings.

Fourth, a defendant may testify at a voluntariness hearing without worry that their testimony will be used in any way at trial.  See Chang, 144 Hawai'i at 545, 445 P.3d at 126 (defendant "ha[s] the right to testify for the purpose of [a] motion to suppress without having that testimony used against [them] at trial").  This shield maintains a wall between the hearing and the trial, letting an accused speak freely about the environment surrounding their statement.

Next, two distinct colloquy requirements apply.

First, the court should conduct a brief colloquy at the voluntariness hearing.  To facilitate an informed decision, the court provides this colloquy after the prosecution completes its

36

evidence, when the defendant can assess what the State has presented. The court should confirm the defendant understands: (1) the hearing decides only whether the statement was voluntary; it does not address guilt or innocence; (2) there is both a right to testify and not to testify at the hearing; (3) testimony, if given, is limited to the statement's circumstances and is inadmissible at trial, see Chang, 144 Hawaiʻi at 545, 445 P.3d at 126; and (4) the decision belongs to the defendant after consulting with counsel, and is the defendant's choice.

Second, a separate colloquy is required when a defendant waives the hearing. While a defendant may stipulate to the voluntariness of their statement, a waiver requires judicial confirmation. When a defendant wants to waive a voluntariness hearing, the court should confirm the defendant understands: (1) the prosecution intends to introduce the statement at trial; (2) the right to a hearing to challenge voluntariness exists; (3) testimony offered at a hearing cannot be used at trial; and (4) the decision to waive belongs to the defendant after consulting with counsel, and is the defendant's choice.

Despite waiver, courts retain authority to order hearings when circumstances suggest involuntariness. See Provident Funding Assocs., L.P. v. Gardner, 149 Hawaiʻi 288, 299, 488 P.3d 1267, 1278 (2021) (quoting Gakiya v. Hallmark Props., Inc., 68 Haw. 550, 555, 722 P.2d 460, 464 (1986)) ("stipulations [may] be

set aside or modified in order to prevent manifest injustice"). Here, for instance, the context of Tolentino's statement compelled a hearing. The circumstances - temporal proximity between violence and statement, a head injury, custody, and possible confusion or disorientation (insisting he was "trying to get a Zip Pac") - raised serious questions about voluntariness. A stipulation of voluntariness would not have been sufficient.

Voluntariness hearing colloquies may be less extensive than for trial testimony or plea changes. Those advisements address more fundamental constitutional choices. Tachibana colloquies address a crucial defendant decision. See Tachibana, 79 Hawai'i at 236, 900 P.2d at 1303 (right to testify); State v. Torres, 144 Hawai'i 282, 294, 439 P.3d 234, 246 (2019) (right not to testify); Hirata, 152 Hawai'i at 34, 520 P.3d at 232 ("[t]he choice to testify, or not, is the biggest decision a defendant makes at trial"). And change of plea colloquies address waiver of trial and admission of guilt. See State v. Solomon, 107 Hawai'i 117, 127, 111 P.3d 12, 22 (2005) (plea colloquy); Wong v. Among, 52 Haw. 420, 425, 477 P.2d 630, 634 (1970) ("[a] plea of guilty in itself is a conviction and a simultaneous waiver of several important constitutional guarantees").

In contrast, voluntariness hearings resolve a discrete admissibility question before trial. Because the constitutional

stakes are lower, deficiencies in voluntariness hearing advisements are less constitutionally significant than deficiencies in Tachibana or plea colloquies.

Sixth, the trial court must make findings of fact and conclusions of law on voluntariness. This final procedural feature ensures a reliable record for review by documenting the court's assessment of the disputed circumstances surrounding the defendant's words. See, e.g., Naititi, 104 Hawai'i at 230-31, 87 P.3d at 899-900.

In sum, fundamental fairness forbids convictions based on involuntary statements. The individual autonomy and human dignity at the heart of the right against self-incrimination equally forbid convictions based on involuntary statements.

The constitutional prohibition is clear. The State may not use an involuntary statement to convict. Yet the procedural enforcement mechanism has lacked similar clarity. When must a court hold an evidentiary voluntariness hearing? What statements activate this duty? What specific procedures must a court follow? We provide that clarity today.

The dissent's complaint is more particular. The dissent recognizes that some definitional work is unavoidable. It maintains however that we have done more than this case requires. It suggests we should have ruled on Tolentino's apology in isolation, without defining the scope of what

constitutes an inculpatory statement. Such standards, the dissent insists, are problems for another day.

This framing understates what this case requires. Tolentino's statement is not an outright confession; it's an ambiguous apology paired with an explanation. If "confession" in HRS § 621-26 reached only express admissions of guilt, the statute would not have required a pretrial hearing for Tolentino's apology. To rule for Tolentino, we must interpret HRS § 621-26 and article I, sections 5 and 10 to include inculpatory statements that fall short of full confessions. Because that interpretation decides this case, defining the boundaries of what counts as inculpatory is not optional. It is the very interpretive task this case demands.

The dissent's stakeholder argument misunderstands our role. The HRPP Standing Committee drafts and proposes procedural rules. It does not interpret HRS § 621-26 and article I, sections 5, 10, or 14.

Defining an "inculpatory statement" is a matter of constitutional and statutory interpretation, not a task for a rules committee to propose. The work involves establishing the rule's reach and anchoring the analysis in our precedent. The process also requires situating the safeguard within Hawai'i's broader constitutional tradition. Only this court possesses the

authority to perform such interpretive work, a responsibility fulfilled whenever a case presents the question.

Today's opinion does that work. So have many before it.

The preference for a restricted opinion overlooks our practice. When this court resolves a case that turns on a procedural right, we do not stop at the facts. We articulate operative rules clearly to guide future cases and forestall recurring litigation.

Recent examples make the point. In Zuffante, we held that the Hawai'i Constitution's due process clause requires recording of custodial interrogations, a procedural rule overruling State v. Kekona, 77 Hawai'i 403, 886 P.2d 740 (1994). 157 Hawai'i at 204-06, 576 P.3d at 253-55. In State v. Kaneaiakala, we prospectively required trial courts to evaluate the impact of suggestive procedures on eyewitness identification reliability and instruct juries accordingly, creating a framework that overruled State v. Padilla in part. 145 Hawai'i 231, 234-236, 450 P.3d 761, 764-66 (2019).

The pattern is longstanding. In Tachibana, we established a five-part colloquy previously unknown to our law, prospectively binding all trial courts. 79 Hawai'i at 236 n.7, 236-38, 900 P.2d at 1303 n.7, 1303-05. In State v. Lewis, we extended those requirements to include a pretrial advisement of the right to testify. 94 Hawai'i 292, 297, 12 P.3d 1233, 1238

41

(2000).  In State v. Ketchum, we announced a bright-line rule: custody under article I, section 10 attaches when probable cause to arrest develops, going beyond the federal Miranda protections.  97 Hawai'i 107, 126, 34 P.3d 1006, 1025 (2001).  In State v. Tetu, this court recognized a defendant's constitutional right to access an alleged crime scene on private property subject to restrictions, a procedural protection grounded in article I, sections 5 and 14.  139 Hawai'i 207, 210, 386 P.3d 844, 847 (2016).  In Chang, we announced a prospective rule barring consolidation of suppression hearings with bench trials.  144 Hawai'i at 546, 445 P.3d at 127.  And in State v. Glenn, we prospectively required colloquies for penal-responsibility waivers.  148 Hawai'i 112, 124-25, 468 P.3d 126, 138-39 (2020).

Those precedents did more than adjudicate the immediate controversy.  They supplied direction where an interpretive fog had obscured essential protections.  They provided forward-looking guidance.

None of these decisions paused for committee consensus or public comment.  The dissent's approach would have idled every one of them.

The dissent would demote today's holding to dicta. Treating it that way would undercut the court's lawmaking function every time a case turns on a procedural right.

42

Tolentino asked whether the trial court erred by admitting his statement without a voluntariness hearing. Answering that question requires saying what compels the hearing, when it must occur, and how it must be conducted. A ruling that resolves the question presented is not dicta. It's the holding.

The dissent tries to distinguish Tachibana, Glenn, and Tetu on the ground that the parties in those cases raised arguments tied to the new rules. Raising an issue is not the same as crafting a rule. The court does the crafting.

In Tachibana, the State urged a "demand" approach for waiver of the right to testify. 79 Hawai'i at 233, 900 P.2d at 1300. This court said no, and adopted a detailed colloquy procedure — the advisements, the timing, the on-the-record findings — that neither party had briefed. Id. at 236-37, 900 P.2d at 1303-04. The parties teed up the question. The court built the answer.

Glenn presented this question: whether a trial court must conduct a colloquy on the penal-responsibility defense. 148 Hawai'i at 123, 468 P.3d at 137. This court said yes, then articulated what the colloquy must contain, when it must occur, and what record must be made. Id. at 125-26, 468 P.3d at 139-40. Those details came from the court.

Tetu started as a discrete request. Defense counsel asked for access to a private condominium where the burglary allegedly

occurred.  139 Hawai'i at 210, 386 P.3d at 847.  The court fashioned rules for crime-scene access in the cases that followed.  Id. at 222-23, 386 P.3d at 859-60.

Ketchum and Chang put the pattern past doubt.  In Ketchum, the court announced a bright-line custody rule no party had asked it to draw.  97 Hawai'i at 126, 34 P.3d at 1025.  The rule was meant to guide courts, the bar, and law enforcement, not to resolve Ketchum's case alone.  Id. at 117 n.19, 34 P.3d at 1017 n.19.  In Chang, both parties had agreed to consolidate the suppression hearing with trial.  144 Hawai'i at 537, 445 P.3d at 118.  The court nonetheless overruled forty years of precedent permitting consolidation.  Id. at 546, 445 P.3d at 127.

In none of these cases did the rule come from the briefs.  Parties raised questions, lodged arguments, drew lines around the issues.  None drafted the rules the court announced.  The dissent's distinction misses the gap.

Crafting rules is this court's constitutional charge.  Always has been.

Dissenters have lodged the same complaint before.  Chief Justice Recktenwald in Chang.  Justice Ginoza in Zuffante.  See 144 Hawai'i at 556, 445 P.3d at 137 (Recktenwald, C.J., dissenting); 157 Hawai'i at 213, 576 P.3d at 262 (Ginoza, J., dissenting).  The complaint has not landed.  The cases stand.  So does this court's settled practice.

44

Our case is no outlier.  Tolentino asked whether the trial court erred by admitting his statement without a voluntariness hearing.  Answering required spelling out what HRS § 621-26's protection looks like in operation.  The rule reaches further than these facts.  Trial courts can apply it.  Defendants can invoke it.  The State can rely on it.  The law becomes more predictable.  And that predictability serves everyone.

The parties were not silent along the way.

At oral argument, they engaged the questions the rule addresses.  See State v. Tolentino, No. SCWC-22-0000255, Thursday, December 18, 2025, 10:30 a.m., Oral Argument, https://www.courts.state.hi.us/oral-argument-before-the-supreme-court-scwc-22-0000255 [https://perma.cc/CN3D-QLEW].  They discussed what makes a statement inculpatory - content, context, and the prosecution's intended use.  They explored the statements the rule covers, including direct admissions, ambiguous statements, and false exculpatory statements offered to show consciousness of guilt.  The State broadly agreed that statements of that kind warrant a voluntariness hearing.

The parties took up timing.  The State agreed that the voluntariness hearing should have been held before trial and asked us to make the rule prospective.  It conceded that the mid-trial procedure used here was "problematic and should be done differently in the future."  The concession was well-taken.

45

HRS § 621-26 requires an evidentiary hearing before trial.  The ruling here was not evidentiary, and it was not before trial.

The parties did not brief every nuance.  But they worked through the core questions.  The State's positions confirmed what the law requires.

The dissent invokes Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4).  The rule does not apply.

Rule 28(b)(4) addresses a single situation:  when this court "contemplates basing the <u>disposition</u> of the case wholly or in part upon an <u>issue</u> of plain <u>error</u> not raised by the parties."  HRAP Rule 28(b)(4) (emphases added).

Three words do the work:  disposition, issue, and error.

The rule applies only when appellate courts "affirm, reverse, or vacate" on an issue of error no party raised.  <u>Id.</u>  Plain error doctrine lets an appellate court correct an unjust outcome the parties failed to flag.  The rule does not strip appellate courts of their authority and responsibility to articulate the operative rules governing issues raised that decisions demand.

This opinion corrects the error Tolentino raised.  The disposition rests on the issue Tolentino presented — whether the trial court erred by admitting his statement without a voluntariness hearing.  Articulating the applicable legal framework governing that issue is not the basis of that

46

disposition.  It is the answer to the issue Tolentino put before this court.  The rules govern how the disposition works, not how an error gets corrected.

The dissent reaches past Rule 28(b)(4)'s text to the legislative history of a bill that never became law.  The rule itself is narrower by design.  See Order Amending Rule 28(b)(4) of the Hawai'i Rules of Appellate Procedure, SCRU-10-0000012 (Aug. 30, 2021).  The failed bill would have policed every doctrinal step and nuance the parties did not lay out themselves.  It would have intruded on this court's exclusive rulemaking power.  See Haw. Const. art. VI, § 7.  The dissent reads into Rule 28 what it was written not to say.

Worries about overburdening the courts also miss the mark. The rule attaches only when the State fulfills its Rule 16 disclosure duties for statements qualifying as inculpatory under this opinion's definition.  Surprise statements surfacing at trial remain governed by Green, a rule requiring a determination outside the jury's presence that has functioned for over half a century.  We do not invent new burdens.  We simply clarify the standards trial courts must follow when the prosecution relies on a defendant's own words to prove the case.

Tolentino's case demands the same systemic clarity.  The ICA's decision confirms that the reach of HRS § 621-26 and article I, sections 5, 10, and 14 remains imperfectly

47

understood.  By reading the law to require a mere voluntariness determination rather than an evidentiary hearing, the ICA narrowed the procedural safeguard beyond what the text and our precedent allow.

Restraint without clarity is not restraint.  It is work pushed onto the next case.  Resolving the appeal without setting the rule's contours and procedure would leave trial courts guessing.  The same litigation would return under different facts, case after case.  Judicial economy demands the opposite.  Saying what the law requires is not dicta when it answers the question a case raises and forecloses the next round of needless appeals.  See Schwartz v. State, 136 Hawai'i 258, 280, 361 P.3d 1161, 1183 (2015) (dicta is what is "not directly upon the question before the court").

## VI.

We vacate the ICA's Judgment on Appeal and the Circuit Court of the First Circuit's Judgment of Conviction and Sentence, and remand to the circuit court.

Kai Lawrence
for petitioner

Brian R. Vincent
for respondent

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Rebecca A. Copeland

